[Cite as *Adams v. Bankers Trust Co.*, 2014-Ohio-231.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY   COUNTY**

| | | |
|---|---|---|
| BRIAN W. ADAMS | : | |
| | : | Appellate Case Nos. 25703 |
| Plaintiff-Appellant/Cross-Appellee | : | 25706 |
| | : | |
| v. | : | Trial Court No.2010-CV-6952 |
| | : | |
| BANKERS TRUST COMPANY, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees/Cross-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of January, 2014.

. . . . . . . . . . .

JOSEPH E. RUETH, Atty. Reg. #0029964 and EDWARD M. SMITH, Atty. Reg. #0010272, Nolan, Sprowl & Smith, 500 Performance Place, 109 North Main Street, Dayton, Ohio 45402
        Attorneys for Plaintiff-Appellant/Cross-Appellee, Brian W. Adams

ALAN A. BIEGEL, Atty. Reg. #0006139, Alan A. Biegel Co., LPA, 5975 Kentshire Drive, Kettering, Ohio 45440, and SUE SEEBERGER, Atty. Reg. #0059730, 5972 Kentshire Drive, Suite D, Dayton, Ohio 45440
        Attorneys for Defendant-Appellee/Cross-Appellant, Silhouettes, LTD.

. . . . . . . . . . . .

HALL, J.,

{¶ 1}    Plaintiff Brian W. Adams appeals from the trial court's entry of judgment against

him on his complaint seeking to foreclose on residential real estate to satisfy a domesticated foreign judgment. Also pending before us is a cross appeal by defendant Silhouettes, Ltd.

{¶ 2}    The facts underlying the present dispute are summarized in the trial court's March 1, 2013 judgment as follows:

This modern "Gordian Knot" involves the financial entanglements of Defendant Stephen England, a retired physician and his deceased wife, Katherine England and a piece of real estate located in Washington Township, Montgomery County, Ohio. Further complicating the matter is the introduction of a certificate of judgment that was recorded against this same piece of property by Plaintiff Wilson Adams after Adams obtained a default judgment against Dr. and Mrs. England in Arizona. Other threads intertwined in this matter and creating confusion are the issue of Defendant Stephen England's bankruptcy and the effect its discharge had upon his debts, the death of Dr. England's wife and the death of Wilson Adams.

The following are relevant facts in this case:

Dr. Stephen England met Plaintiff Wilson Adams in Montgomery County, Ohio in the early 1970's. During the 1970's and 1980's, the evidence revealed that England and Adams had engaged in several business deals in Montgomery County and in Arizona involving real estate. The last deal involved England fronting money to Adams so that Adams could purchase a home in Arizona. The evidence further revealed that the parties had no written contract to memorialize the terms of their agreement; however, the names of Dr. and Mrs. England had been placed

on the deed to Adams' house thereby ensuring that the Defendants would receive notice whenever the Plaintiffs decided to sell the Arizona realty.

After living in the Arizona property for approximately thirteen years, Wilson and Navajo Adams decided to sell the property. During the pendency of the sale, a dispute concerning whether costs claimed by the Plaintiffs were renovations, that would be split between the parties, versus maintenance expenses borne solely by the Plaintiffs arose. To resolve the dispute, England agreed to a 60 – 40% distribution of the proceeds in favor of Adams rather than the 50 – 50% distribution originally agreed upon. At the same time that Wilson and Navajo Adams were living in the Arizona house, Stephan and Katherine England had built and were living in a residence located at 1652 Ladera Trail in Montgomery County, Ohio. It was alleged that the property was, at least partially, funded with money loaned to the couple from Dr. England's mother Dorothy (England) Masters; the original deed holder was Katherine England.

In May, 1990, Katherine England, as sole owner of the Ladera Trail property[,] executed a quit-claim deed releasing her exclusive rights to the property in favor of her husband and herself in equal parts. The quit-claim deed was recorded by the Montgomery County Recorder on June 1, 1990.

In 1993 and after the sale of the Arizona realty, Wilson and Navajo Adams filed a lawsuit in Maricopa County, Arizona. The [Adamses], as plaintiffs in the Arizona case, alleged that they were entitled to recover the entire amount of costs incurred during the sale of the house. That lawsuit named Katherine and Stephen

England as defendants and alleged that the Defendants owed the Adams[es] for the entire costs of repairs to the real property.

During the pendency of the Arizona lawsuit and in 1994, Stephen England filed a Chapter 11 bankruptcy case in the Federal Court for the Southern District of Ohio. One of the debts listed in this bankruptcy case was the suit brought against himself and Katherine England in Arizona. At the conclusion of the bankruptcy proceedings, the debts that were the subject of the Arizona lawsuit against Stephen England were discharged. The lawsuit continued against Katherine England. The matter was set for trial in Arizona on January 9, 1996.

While the trial of the Arizona lawsuit was pending and on January 11, 1996, Defendants Stephen England and Katherine England, as mortgagors, used the Ladera Trail property as collateral for a mortgage granted to Stephen England's mother, Dorothy (England) Masters as security for a series of eight past and current loans. The loans totaled FOUR HUNDRED SEVENTY-SEVEN THOUSAND FIVE HUNDRED THIRTY-THREE DOLLARS AND EIGHTY-TWO CENTS ($477,533.82). The mortgage deed listed the eight occasions when Dorothy (England) Masters loaned the money to Stephen and Katherine England; the beginning date was December 28, 1983, the last two loans were made on March 4, 1983 [sic]. The mortgage instrument was executed by the parties on January 11, 1996 and recorded in the Montgomery County Recorder's Office the next day, January 12, 1996.

On March 8, 1996, the judge in the Maricopa County case rendered a

default judgment against Katherine England. This decision ordered Katherine England to pay to the [Adamses] $21,064.34 plus $10,000.00 attorney fees plus costs of $1,106.25 for a total of $32,170.59 with interest accruing at 10% per annum and was filed on March 12, 1996 in Arizona.

The Arizona judgment was domesticated in the State of Ohio on April 11, 1996. This judgment was renewed in Ohio and subsequently updated pursuant to Ohio law. On or about September 25, 1998, Navaho Adams assigned her right and title in the judgment to the Plaintiff Brian W. Adams, as the sole beneficiary and personal representative of the estate of Wilson O. Adams.

On August 17, 1999, Dorothy (England) Masters assigned her interest in the mortgage on the Ladera Trail property to the First State Bank of Atlanta, Georgia. The property was an asset of a trust she created. The assignment of the mortgaged [sic] was recorded by the Montgomery County Recorder on August 24, 1999.

On September 5, 2006, the CEO of First State Bank of Atlanta, Georgia assigned the bank's interest in the property to the Community National Bank as successor in interest. This deed was recorded by the Montgomery County Recorder on September 18, 2006.

Four years later on September 15, 2010, National Bank and Trust Company as successor in interest to the Community National Bank assigned its rights in the Ladera Trail property back to Dorothy (England) Masters. This entry was journalized by the Montgomery County Recorder on October 18, 2010.

On November 29, 2010, Dorothy (England) Masters executed two documents in Missouri. The first document was entitled "Assignment of Obligation." In this document, Dorothy Masters assigned her interest in the Ladera Trail property into a limited partnership called Silhouettes, LTD owned by members of her family. This document was filed with the Montgomery County Recorder on December 10, 2010.

No evidence was presented to show that any part of the alleged debt had been repaid. Thereafter, Katherine England died. Her estate has not been probated. (Doc. #75 at 2-5).

{¶ 3}    Brian Adams filed the present lawsuit in August 2010 seeking to foreclose on the Ladera Trail property to satisfy the domesticated Arizona judgment. In an April 2012 partial summary judgment ruling, the trial court found that the Arizona judgment was valid and that it constituted an enforceable lien on the Ladera Trail property. (Doc. #73). Following an April 2012 bench trial, the trial court held that Adams was not entitled to foreclose on the Ladera Trail property despite his valid judgment and enforceable lien. In support, the trial court reasoned in relevant part:

* * * The Court finds that on the date of January 11, 1996, Defendants Dr. and Mrs. England were the owners of the Ladera Trails property and executed a valid mortgage deed to Dorothy (England) Masters. That mortgage was promptly recorded on January 12, 1996. As of that date any interest in the Ladera Trails property that Dr. and Mrs. England held was transferred to Dorothy (England) Masters; and as a matter of law, it became her property on the date the documents

were delivered for recording.

At the time that the Montgomery County, Ohio property was transferred, the foreign suit, that is, the trial on the contested issues in Maricopa County, Arizona[,] was still pending. That lawsuit was not decided until the judge in Arizona filed the Court's decision on March 12, 1996, and the Arizona decision was not perfected or domesticated in Ohio until April 11, 1996.

While the Defendants' decision to make the property transfer to Defendant Dorothy (England) Masters while the Arizona lawsuit was pending might raise suspicions, upon review of the testimony and evidence at trial this Court concludes that there is not sufficient evidence to conclude that these defendants engaged in a fraudulent act. The evidence shows that Dorothy (England) Masters made eight loans to her son and daughter in law prior to the conclusion of the Arizona trial; those loans were memorialized in documentation that was properly recorded by the Montgomery County Recorder. Further, at the time that Dorothy (England) Masters recorded the mortgage, the Arizona trial was not concluded. Although the decision to grant a default judgment in the case was a distinct possibility at the time that the Ohio mortgage was granted, that decision was not a certainty. Based on this fact alone, the Court cannot find that the Defendants engaged in a fraudulent conveyance of the property.

The evidence further reveals that Dorothy (England) Masters used the Montgomery County property as collateral for other business transactions. This act bolsters the Defendants' claim that the transaction between the Defendants

Stephen and Katherine England and Dorothy (England) Masters was legitimate.

As a matter of law, Dorothy (England) Masters' mortgage and her decision to record this document "…reflects the time-honored rule of 'first in time, first in right.'" [Citation omitted]. At the time the mortgage was recorded, or on the date of January 12, 1996, Dr. and Mrs. England transferred their interest in the property to Dorothy (England) Masters. The Plaintiff's interests in the property are inferior to the interest of Dorothy (England) Masters. Because the Defendants transferred their interests in the Ladera Trails property before the Plaintiff domesticated the Arizona judgment, the Defendants' interests are superior to those of the Plaintiff. As a matter of law, the Plaintiff, Brian Adams[,] is not entitled to use his domesticated judgment as a predicate to a foreclosure action.

The Plaintiff's argument that Dorothy (England) Masters' assignment of the property after he domesticated his judgment [sic] is also not well taken. The assignment by Mrs. Masters does not create a break in the title allowing ownership in the property to revert to Stephen and Katherine England. The record does not support the suggestion that the assignments of property by Dorothy (England) Masters to various banks were fraudulent.

(Doc. #75 at 8-10).

{¶ 4} Adams advances the following four assignments of error on appeal:

I. THE TRIAL COURT ERRED IN FINDING THAT THE MORTGAGE ACTED AS A TOTAL TRANSFER OF THE REAL ESTATE PROHIBITING FORECLOSURE.

II. THE TRIAL COURT ERRED IN DENYING APPELLANT THE RIGHT TO FORECLOSE ON HIS CERTIFICATE OF JUDGMENT LIEN.

III. THE TRIAL COURT ERRED IN FINDING THAT THERE IS A VALID MORTGAGE SUPERIOR TO APPELLANT'S CERTIFICATE OF JUDGMENT.

IV. THE TRIAL COURT ERRED IN RELYING ON HEARSAY IN REACHING ITS DETERMINATION OF A VALID DEBT AND MORTGAGE.

{¶ 5}    Adams' first assignment of error challenges the trial court's finding that Stephen and Katherine England transferred their entire interest in the Ladera Trail real estate to Dorothy Masters when they gave her a mortgage. As set forth above, the trial court reasoned: "As of that date any interest in the Ladera Trails property that Dr. and Mrs. England held was transferred to Dorothy (England) Masters; and as a matter of law, it became her property on the date the documents were delivered for recording." (Doc. #75 at 8). Appellee Silhouettes concedes that the trial court erred in reaching this conclusion, and we agree. The granting of a mortgage to Dorothy Masters did not make the Ladera Trail real estate her property. A mortgage merely secures the payment of a debt by creating a lien. It does not transfer ownership to the mortgage holder. *See*, *e.g.*, *Stand Energy Corp. v. Epler*, 163 Ohio App.3d 354, 2005-Ohio-4820, 837 N.E.2d 1229, ¶ 13 (10th Dist.2005) (recognizing that "in Ohio, a mortgage is merely a security for a debt, and the legal and equitable title to the property remains in the mortgagor"). Accordingly, the first assignment of error is sustained.

{¶ 6}    In his second assignment of error, Adams contends the trial court erred in not allowing him to foreclose on the Ladera Trail property. Although the trial court found that he

held a valid judgment lien, it noted that his judgment was neither obtained nor domesticated in Ohio prior to Dorothy Masters obtaining her mortgage from Stephen and Katherine England. The trial court appears to have believed that foreclosure was not available to Adams under these facts. We disagree.

{¶ 7}    The record supports the trial court's finding that the Englands gave Dorothy Masters a mortgage before the Arizona judgment at issue was obtained and domesticated here. The record also supports the finding, addressed further in our discussion of Assignment of Error III, that Adams' judgment lien is subordinate to the recorded mortgage to Masters and her assigns. But that fact would not preclude Adams from foreclosing. This court and others have recognized that a junior lien holder may initiate a foreclosure action. *See ITT Financial Services v. Hess*, 2d Dist. Miami No. 88-CA-04, 1988 WL 120110, *1 (Nov. 1, 1988) (reasoning that "if a debt secured by a senior mortgage is in default * * * the holder of the senior mortgage is both a proper and necessary party to a foreclosure action filed by a junior mortgagee"); *Soc. Bank & Trust Co. v. Zigterman*, 82 Ohio App.3d 124, 127, 611 N.E.2d 477, 478 (3d Dist.1992) (opining that "if the senior mortgagee is named as a party-defendant, or intervenes in the action to assert its interest, it receives priority in the distribution of the sale proceeds, even if a junior mortgagee initiated the action"). It may well be that the first mortgage exceeds any potential proceeds, leaving the junior lien holder with nothing. But, contrary to the trial court's ruling, we see nothing about the mortgage to Dorothy Masters that precludes Adams, the holder of a judgment lien, from foreclosing on the Ladera Trail property. The second assignment of error is sustained.

{¶ 8}    In his third assignment of error, Adams claims the trial court erred in finding that Dorothy Masters held a mortgage that was superior to his judgment lien. Adams reasons that a

valid mortgage cannot exist unless there exists a promise to pay an underlying debt with terms that are known.   He contends those requirements were not met here. We are unpersuaded.

{¶ 9}   Stephen England's testimony supports a finding that he and Katherine England borrowed a total of $477,533.82 from his mother, that they agreed to repay the money, and that no repayment occurred. (Tr. at 14, 17-18). Although no notes were signed, they were not required. A note is mere evidence of a debt, not the debt itself. *Riegel v. Belt*, 119 Ohio St. 369, 164 N.E. 347 (1928), at syllabus ("The purpose of a mortgage is to secure the payment of a debt. A note described in the condition of a mortgage is only evidence of the debt."). The existence of a debt secured by a mortgage may be established without a note. *Hall v. Snyder*, 10th Dist. Franklin No. 91AP-1292, 1992 WL180108, *4 (July 21, 1992) ("[T]he actual existence or non-existence of the note is not determinative of there being consideration for the mortgage."); *see also Mitchell Bank v. Schanke*, 268 Wis.2d 571, 596, 676 N.W.2d 849, 860 (Wis.2004) ("What matters is the debt itself, not the Note. Thus, the proper inquiry is whether the Bank failed to prove the debt secured by the Mortgage.").

{¶ 10}   As the trier of fact, the trial court was entitled to credit Stephen England's testimony that he and his wife borrowed $477,533.82 from Dorothy Masters, promised to repay the money, and still owed the debt. The record also supports the trial court's finding, based on the evidence before it, that the recorded mortgage to Dorothy Masters was legitimate and not fraudulent. Although the mortgage was memorialized shortly before the Arizona judgment was obtained, that fact does not necessarily establish a fraudulent intent. If the $477,533.82 debt actually existed, as the trial court found, then Dorothy Masters legitimately, and prudently, may have decided to secure payment of the debt by recording a mortgage before the Arizona lawsuit

was resolved.

{¶ 11}   On appeal, Adams complains that Stephen England's debt to his mother was discharged in his bankruptcy and that the mortgage at issue was not recorded until after the discharge, meaning that it secured a non-existent debt. Even if this is true with regard to Stephen England,[1] Katherine England did not participate in his bankruptcy, and she was a co-borrower of the $477,533.82 from Dorothy Masters. We note too that Stephen England's bankruptcy prevented a judgment against him in the Arizona lawsuit. The judgment was against only Katherine England. As a result, Adams' judgment lien attached only to her undivided one-half interest in the Ladera Trail real estate, which remained encumbered by Dorothy Masters' pre-existing mortgage.

{¶ 12}   Adams also asserts that the debt to Masters was barred by the applicable statute of limitation. His full argument is as follows:

> This matter continues to be complicated by the fact that the purported original loans were granted in 1983. These were general unsecured debts, not founded on a writing and have a defense of being beyond the statute of limitation. Where the debtor fails to raise the defense, a creditor, harmed by such failure[,] may in equity step into the shoes of the debtor to raise the defense. In this matter, the trial court failed to look at the age of the debt, if any, and make any determination as to the amount of the valid debt that may be underlying the mortgage.

(Appellant Adams' brief at 14).

---

[1] At trial, there was some dispute about whether Stephen England's bankruptcy discharged his debt to his mother. (Tr. at 39-40).

{¶ 13} In response, Silhouettes claims "no authority" exists for Adams to raise another party's potential affirmative defense. Silhouettes also contends Adams waived the statute-of-limitation issue because "there was no mention of that defense in the trial before the Lower Court[.]" (Appellee Silhouettes' brief at 7-8).

{¶ 14} Upon review, we conclude that Adams is not entitled to reversal of the trial court's judgment based on his statute-of-limitation argument. The record reflects that Silhouettes filed a counterclaim and cross claim in which it too requested foreclosure and a judicial sale of the Ladera Trail property based on the mortgage it holds.[2] (Doc. #48). Adams filed an answer asserting, among other things, that Silhouettes' "claims" (apparently its request to foreclose on the mortgage securing repayment of the loans) were "barred by the applicable statute of limitations." (Doc. #50 at ¶ 11). Thereafter, Silhouettes moved for summary judgment on the issue of the priority of its mortgage over Adams' judgment lien. (Doc. #61). Adams' response to this motion did not mention any statute-of-limitation defense to the validity of the $477,533.82 debt or to Silhouettes' effort to foreclose on the mortgage Dorothy Masters assigned to it. (Doc. #66). In any event, the trial court overruled Silhouettes' motion for summary judgment on the priority of its mortgage.[3] (Doc. #73). The case then proceeded to an April 19, 2012, bench trial at which Stephen England was the sole witness. While questioning England, counsel for Adams never raised any statute-of-limitation issue. Following the presentation of evidence and the

---

[2] The trial court does not appear to have ruled on this aspect of the case. Instead, it entered judgment against Adams regarding his right to foreclose and affixed Civ.R. 54(B) certification. (Doc. #75).

[3] We note that the trial court erroneously referred to the summary judgment motion as having been filed by Stephen England. The first page of the motion indicates that it was filed by Silhouettes. (Doc. #61). The trial court's erroneous reference to Stephen England rather than Silhouettes is immaterial for present purposes.

admission of exhibits, the trial court gave the parties an opportunity for closing arguments. The following exchange then occurred between Joseph Rueth, counsel for Adams, and Alan Biegel, counsel for Silhouettes:

> MR. RUETH: * * * [T]he concern I have quite honestly is we've got purported checks or that there's some sort of contract here that's being offered. But that nothing's in writing, nothing's documented. Some of this is 13 years after the fact and actually is unenforceable under some of the statute of limitations. So again, there's a question if not the entire debt, at least a large portion of the debt was non-collectible.
>
> MR. BIEGEL: May I point out to the Court that the statute of limitations is an affirmative defense. It does not eliminate the debt. It simply permits somebody to raise that as a defense. They do not have to, but may. So as far as these obligations being beyond time because they were oral promises or whatever, I don't think—in the absence of evidence that somebody asserted the defense, that's not a good argument.

(Tr. at 54).

{¶ 15}   Following these remarks, the trial court took the matter under advisement. It later filed written findings of fact and conclusions of law, entering judgment in favor of Silhouettes and against Adams on his complaint. (Doc. #75). Although the trial court's ruling did not address the statute-of-limitation issue with regard to the $477,533.82 debt secured by a mortgage, we find no error. In our view, an ambiguous reference, in closing argument, to some part of the debt being "unenforceable under some of the statute of limitations" was insufficient to place the issue

before the trial court or to preserve it for appeal. Adams did not identify any particular statute of limitation or attempt to identify what portion of the debt he believed was non-collectable due to a time bar. Even on appeal, he simply asserts that the debt, or some part of it, is "beyond the statute of limitation" and that the trial court failed to "make any determination as to the amount of valid debt that may be underlying the mortgage." Given Adams' own failure to identify a particular statute of limitation upon which he relies or to identify what part of the debt he believes is time barred, we cannot say the trial court erred in failing to accept his argument.[4]

{¶ 16}   Adams next challenges the assignment of the mortgage from Dorothy Masters to Silhouettes. He claims the assignment resulted in a merger of the mortgage and the underlying debt, thereby extinguishing the mortgage. We disagree. As a result of the assignment, the limited partnership Silhouettes holds the mortgage. The fact that Stephen England is a co-partner does not establish that Silhouettes also owes the debt at issue. "A partnership is an entity distinct from its partners." R.C. 1776.21(A). We see no merger.

---

[4]In light of this conclusion, we need not resolve Silhouettes' argument that Adams cannot assert another party's affirmative defense. We note, however, that authority exists allowing a junior mortgagee or lien holder to assert the statute of limitations against enforcement of a senior mortgage held by another party. *See Curtis v. Island Dev. Corp.*, 102 Ohio App.3d 320, 657 N.E.2d 295 (6th Dist.1995).

{¶ 17} Adams additionally asserts that Silhouettes could not accept an assignment of mortgage from Dorothy Masters because it had been administratively dissolved. At trial, Stephen England disputed whether Silhouettes remained dissolved. (Tr. at 45-46). He testified that it continued to operate normally and in good standing. (*Id*. at 22-23, 46). In any event, regardless of its status as dissolved or reinstated, we see no reason why Silhouettes could not accept the assignment of a mortgage.[5] Even a dissolved corporation is entitled to wind up its affairs, which reasonably might include accepting the assignment of an asset. The third assignment of error is overruled.

{¶ 18} Adams' fourth assignment of error challenges the trial court's reliance on alleged hearsay testimony from Stephen England regarding "Exhibit H," a written assignment from Dorothy Masters to Silhouettes.

{¶ 19} At trial, Stephen England testified without objection that he and his wife had borrowed a total of $477,533.82 from Dorothy Masters. (Tr. at 18). He further testified that he had not repaid any principal or interest. (*Id*.). He also testified without objection about various assignments of the mortgage held by Masters. (*Id*. at 18-21). The assignments included one from Masters, one back to Masters, and, finally, one from Masters to Silhouettes. (*Id*.). With regard to the assignment from Masters to Silhouettes, Stephen England testified without objection that it occurred in November 2010 and transferred the $477,533.82 mortgage from Masters to Silhouettes, a limited partnership in which he was a co-managing partner. (*Id*. at 20-21). Stephen England identified Exhibit G as a copy of the assignment of mortgage. (Id.).

---

[5]In the concluding paragraph of his brief, Adams cites *Federal Home Loan Mortgage Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1217, for the proposition that Silhouettes, as a dissolved entity, lacked standing to assert the mortgage it obtained from Dorothy Masters. We disagree. The facts of *Schwartzwald* bear no similarity to the present case. *Schwartzwald* did not address whether an allegedly dissolved partnership holding a mortgage may participate in a foreclosure proceeding initiated by a junior lien holder.

{¶ 20}   Stephen England then identified Exhibit H as an assignment from Masters to Silhouettes of her right to be repaid the $477,533.82 she had loaned to Stephen and Katherine England. (*Id*. at 23). Adams objected to this exhibit on various grounds, including hearsay. Adams conceded that the document could "speak for itself" regarding Silhouettes' receipt of an assignment of the Englands' alleged financial obligation. Adams argued, however, that the document could not be used to prove, or "validate," the existence of the $477,533.82 debt. (*Id*.). Ultimately, the trial court allowed Exhibit H to be admitted for a "limited purpose." (*Id*. at 53). That purpose appears to have been to show an assignment of the right to collect Stephen and Katherine England's alleged $477,533.82 debt from Dorothy Masters to Silhouettes, but not to prove the validity of the debt.

{¶ 21}   On appeal, Adams claims the trial court erroneously relied on Exhibit H to establish the validity of the $477,533.82 debt. We disagree. The trial court mentioned the disputed exhibit only once. In its findings of fact, it made reference to an "assignment of obligation" from Dorothy Masters to Silhouettes. (Doc. #75 at 5). We cannot infer from this isolated reference that the trial court improperly relied on the exhibit to prove the validity of the debt at issue. Rather, the trial court appears to have relied on other evidence, particularly Stephen England's testimony, to find that Dorothy Masters "made eight loans to her son and daughter in law[.]" (*Id*. at 9). As set forth above, Stephen England's testimony fully supports a finding that he and Katherine England borrowed a total of $477,533.82 from his mother, that they agreed to repay the money, and that no repayment had occurred. (Tr. at 14, 17-18). Therefore, the trial court had no need to rely on Exhibit H to "validate" the debt. The fourth assignment of error is overruled.

{¶ 22}   In its cross appeal, Silhouettes asserts the following assignment of error:

I. THE LOWER COURT ERRED IN CONCLUDING THAT AN ARIZONA COURT JUDGMENT, WHEN FILED IN OHIO PURSUANT TO OHIO REVISED CODE §2329.022, BECOMES AN INDEPENDENT OHIO JUDGMENT TO THE EXTENT THAT IT REMAINS EFFECTIVE IN OHIO NOTWITHSTANDING THE FACT THAT IT EXPIRED AND IS UNENFORCEABLE UNDER OHIO LAW.

**{¶ 23}** Silhouettes' assignment of error challenges the trial court's denial of a motion to dismiss on the basis that the Arizona judgment had "expired" years before Adams sought foreclosure in Ohio.

**{¶ 24}** The record reflects that the Arizona judgment was obtained in March 1996. It was domesticated in Ohio in April 1996. A new certificate of judgment has been filed in Ohio every five years since then. Silhouettes notes, however, that the judgment was not renewed in Arizona. Silhouettes argues that the judgment no longer is enforceable in Arizona and, therefore, that it is not enforceable in Ohio either.

**{¶ 25}** The trial court rejected the foregoing argument, reasoning:

\* \* \* Defendant England argues that the Arizona Judgment against him is no longer valid in Arizona because it was not renewed after the expiration of the initial five year period in Arizona and therefore the Ohio Judgment that is based on the Arizona Judgment is no longer valid despite the Ohio Judgment having been renewed in Ohio.

ORC 2329.22 provides that:

A copy of any foreign judgment authenticated in accordance with section 1738 of Title 28 of the United States Code, 62 Stat.

947 (1948), may be filed with the clerk of any court of common pleas. The clerk shall treat the foreign judgment in the same manner as a judgment of a court of common pleas. A foreign judgment filed pursuant to this section has the same effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, or staying as a judgment of a court of common pleas and may be enforced or satisfied in the same manner as a judgment of a court of common pleas. *ORC Ann. 2329.022*

Based on the plain reading of ORC 2329.022, once properly domesticated, a foreign judgment becomes for all relevant purposes an Ohio Judgment. It is clear that the original Arizona Judgment was properly domesticated and renewed in Ohio, thereby making it a valid and enforceable Ohio Judgment "subject to the same procedures, defenses, and proceedings for reopening, vacating, or staying as a judgment of a court of common pleas and may be enforced or satisfied in the same manner as a judgment of a court of common pleas." *Id.* Whether or not the Judgment was renewed in Arizona is immaterial. * * *

(Doc. #73 at 3-4).

{¶ 26} Upon review, we agree with the trial court. Once a foreign judgment is domesticated, R.C. 2329.022 provides that it must be treated "in the same manner as a judgment of a court of common pleas." More specifically, it is subject to the "same procedures" and "may be enforced or satisfied in the same manner as a judgment of a court of common pleas." Here the domesticated judgment properly was renewed in Ohio every five years. Accordingly, under R.C. 2329.022 it is entitled to be enforced in the same manner as any Ohio judgment that properly has

been renewed.

{¶ 27} The case law upon which Silhouettes relies is not to the contrary. None of the cases it cites addresses the issue before us. The first case, *Holzemer v. Urbanski*, 86 Ohio St.3d 129, 712 N.E.2d 713 (1999), addresses the res judicata effect of a Michigan proceeding. In the course of its ruling, the *Holzemer* court recognized that "[t]he doctrine of full faith and credit" obligates Ohio courts to give foreign proceedings the same effect they would have in the foreign state. We do not disagree with this general proposition. The Arizona judgment received full faith and credit when it was domesticated here pursuant to R.C. 2329.022. It then was treated as an Ohio judgment and properly renewed every five years.

{¶ 28} Silhouettes also cites *DLM Joint Venture v. Mershon's World of Cars, Inc*., 2d Dist. Clark No. 94-CA-95, 1995 WL 59718 (Jan. 5, 1995). The issue there was whether a direct appeal from a Texas judgment could be taken in Ohio. This court concluded that it could not, pointing out that a foreign judgment does not actually become an Ohio judgment by virtue of being domesticated. Rather, it remains a foreign judgment that must be treated as an Ohio judgment for enforcement purposes. *Id.* at *2. We do not disagree. As we explained above, the domesticated Arizona judgment properly was renewed in Ohio every five years. Accordingly, under R.C. 2329.022 it is entitled to be enforced in the same manner as any properly renewed Ohio judgment.

{¶ 29} Silhouettes additionally relies on *Rita Ann Dist. v. Brown Drug Co.*, 164 Ohio App.3d 145, 2005-Ohio-5786, 841 N.E.2d 400 (2d Dist.). There this court refused to give full faith and credit to a Maryland default judgment where personal jurisdiction over the defendant was lacking. This court's analysis in *Rita Ann Dist*. has no applicability here. The final case upon which Silhouettes relies, *Reyna v. Escobar*, 3d Dist. Seneca No. 13-04-39, 2005-Ohio-424, is

equally inapplicable. *Reyna* involved a domesticated judgment obtained in a Texas foreclosure action. The judgment debtor sought relief from the judgment under Civ.R. 60(B). The trial court denied relief, and the Third District affirmed. We see nothing in *Reyna* that would alter our analysis above. Silhouettes' cross assignment of error is overruled.

{¶ 30}   Having sustained Adams' first and second assignments of error, we reverse the trial court's judgment insofar as it precluded him from foreclosing and remand the cause for further proceedings.[6]

. . . . . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

Joseph E. Rueth
Edward M. Smith
Alan A. Biegel
Sue Seeberger
Patrick Quinn
Douglas Trout
Dorothy Masters
Dr. Stephen England
Bankers Trust Company
Chase Bank

---

[6] As noted above, Silhouettes filed a counterclaim and cross claim in which it too sought foreclosure and a judicial sale of the Ladera Trail property. (Doc. #48). The trial court does not appear to have ruled on this aspect of the case, choosing instead to enter judgment against Adams regarding his right to foreclose and including Civ.R. 54(B) certification. (Doc. #75).

The Community National Bank
Normandy Office Associates
Hon. Frances E. McGee